Filed 10/7/14  In re K.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065636 |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1128) |
| v. | |
| K.A., et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant K.A.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant B.S.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

K.A. (Mother) appeals an order denying her Welfare and Institutions Code[1] section 388 modification petition. The Mother and B.S. (Father) also appeal that same order that terminated their parental rights to their son, K.S. They contend the juvenile court erred in finding the beneficial parent-child relationship exception did not apply to either of them. (See § 366.26, subd. (c)(1)(B)(i).) We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

K.S. was the victim of horrific child abuse. Concerned that K.S. was moaning, not eating well, had diarrhea and a tongue laceration, the Mother took K.S. to the hospital when he was four months old. Two doctors evaluated K.S., and they determined that K.S. had healing rib fractures, femur and tibia fractures, facial bruises, scarring on his back, and a lacerated liver that caused internal bleeding, requiring a blood transfusion. Had the Mother not brought K.S. to the hospital, he could have died from the blood loss.

When questioned by doctors and a police detective, both the Mother and the Father claimed they did not know how K.S. was injured. In addition, they denied hurting K.S. in any way and stated he was a happy baby with no major illnesses. The Father later questioned if some of the injuries were due to a speaker that fell on K.S. in the car and

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

admitted that he had scratched K.S. with his nails. The Mother suggested she could have fractured K.S.'s leg during a diaper change

The Mother had been K.S.'s primary caregiver since his birth. She claimed she was a " 'hospital alcoholic' " meaning she frequently took K.S. to the doctor. The Father, maternal grandmother, a maternal uncle, and aunts had also cared for K.S. at times, with the grandmother only doing so occasionally.

The San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (b), dependency petition on K.S.'s behalf. At the detention hearing, the juvenile court ordered K.S. detained at Rady Children's Hospital and then placed in foster care or with an approved relative.

A child abuse medical expert, Dr. Marilyn Kaufhold, examined K.S. Kaufhold concluded none of K.S.'s injuries were the result of normal child care. Regarding the liver laceration, she opined the usual mechanism for such an injury was a deep blow to the abdomen in the region of the liver. Kaufhold noted that rib fractures usually resulted from forceful, traumatic chest compression. She additionally opined that the tongue laceration likely resulted from the forceful introduction of a sharp object into K.S.'s mouth.

As of the detention hearing on May 22, 2013, both parents requested appointed counsel, who appeared on their behalf. The juvenile court also appointed a guardian ad litem for K.S. and found the Father was a presumed father under Family Code section 7611, subdivision (d). The juvenile court made a prima facie finding on the initial section 300, subdivision (b) petition, signed off on a stipulated protective order, and

3

ordered K.S.'s detention out of the home following his hospital release, with supervised visitation for the parents.

At the initial jurisdiction/disposition hearing on June 12, 2013, both parents set the matter for trial as to the truth of the allegation. The Agency prepared a jurisdiction/ disposition report wherein it recommended that K.S. remain in out-of-home care and that the parents receive six months of reunification services. At this time, K.S. was in a confidential Angels Foster Family Home.[2]

Subsequently, the juvenile court appointed a court appointed special advocate (CASA) for K.S.

The Agency prepared an addendum to its original jurisdiction/disposition report. Among other things, the report indicated that Kaufhold again examined K.S. toward the end of June 2013 and noted that when K.S.'s back scars were fresh, the skin would have been red, broken, with obvious bleeding or oozing. Kaufhold thus opined that the Mother could not have been unaware of this injury. However, the addendum contained the same recommendation as the original report.

Three weeks later, the Agency filed an additional addendum report in which the Agency changed its recommendation to propose that the parents not be offered reunification services and a section 366.26 hearing be set to determine the appropriate

---

[2]    Angels Foster Family Network is "a [non-profit,] licensed foster family agency with a unique focus on prevention, based on the stable placement of abused infants and toddlers with nurturing families who promote healing and critical attachment, resulting in healthy growth and development." (<http://www.angelsfoster.org/about-angels/> [as of October 3, 2014].)

4

plan for K.S. The Agency stressed that it recommended not offering reunification services under section 361.5 subdivisions (b)(5) and (6). The Agency also made clear it was very concerned that the parents had "no explanation as to how [K.S.] received [his] injuries." The Agency explained: "The parents have also not been truthful with law enforcement regarding the events that brought [K.S.] to the attention of the Agency. Until the parents can be honest with themselves and the Agency as to what role either one or both of them played in the abuse there is no way that they would be able to benefit from services or make progress."

At the contested jurisdiction hearing on August 20, 2013, the juvenile court sustained the petition and assumed jurisdiction over K.S. under section 300, subdivision (e). At the subsequent contested disposition hearing, the juvenile court removed K.S. from his parents' custody and ordered him placed with his paternal grandmother. The juvenile court denied reunification services to the parents under section 361.5, subdivision (b)(5), but ordered supervised visitation for both parents. The court also set a hearing under section 366.26 and ordered the Agency to prepare an assessment report.

K.S. was placed in his paternal grandmother's custody. K.S.'s paternal grandmother and her husband were committed to raising K.S. They were interested in adoption, not legal guardianship of K.S. The grandmother was attentive to K.S.'s emotional needs and she ensured K.S. attended all medical appointments. Beyond the relative caregivers, there were 52 families in the county with approved adoptive home studies interested in a child matching K.S.'s characteristics.

After K.S. was placed in a foster home, the parents managed to have weekly, supervised visits with K.S. beginning while K.S was in foster care, and the visits went well. They brought clothes and toys for K.S., and played and talked with him. However, the foster parents reported it was hard to get K.S. to sleep after Thursday visits with the family, and he would wake up frequently with nightmares and be hard to console.

After the court removed K.S. from the custody of his parents and placed him in the custody of his paternal grandmother, the parents continued their visits with K.S, meeting with him once a week for two hours.[3] The Mother and Father were somewhat reserved and engaged in play with K.S. for brief periods. Overall, the parents appeared physically attentive to K.S. and displayed affection toward him, smiling and giving eye contact while in close proximity. K.S. also was very engaging with his grandmother and appeared to enjoy interaction with other adults as well. At the end of visits, K.S. separated easily from his parents, and without problems, went to his grandmother or reached for her. Despite the previous abuse, K.S. was a happy, cute, alert, playful, engaging baby boy, who was in good health and meeting all developmental milestones. He was a "very friendly baby who appears to enjoy interacting with anyone who gives him attention."

On January 30, 2014, the Mother filed a section 388 petition. In her petition the Mother requested to change the juvenile court order that denied her reunification services

---

[3]    The Mother and Father were given the option to have separate visits with K.S., and did visit K.S. separately at the request of the social worker. However, after a couple separate visits, the parents resumed visiting K.S. together.

and placed K.S. in the paternal grandmother's care. The Mother asserted that since that order, she had continued to engage in services to address the protective issues.

The Mother stated she had enrolled in individual therapy and had completed five therapy sessions. Further, the Mother claimed she acknowledged the severity of K.S.'s injuries, addressed the unhealthy relationship dynamic between herself and the Father, and separated from him.

The Mother also provided information from the letter of atonement that she wrote to K.S. as well as updates from therapists Carole Kries and Brenda Mack. Mack's update noted the Mother's five therapy sessions and included the opinion the Mother had gained insight as to the protective issues. According to Mack's report, the Mother acknowledged the Father had been rough with K.S. and would throw him up in the air when he was two months old. Further, the Mother acknowledged she did not assert herself when the Father minimized his behaviors towards K.S. The Mother also had been concerned regarding K.S.'s well-being when she went to work. She often enlisted a younger brother to be at home with the Father to keep an eye on K.S. And when she worked, she utilized the "free" childcare provided by the Father.

In the Mother's letter of atonement, she took "full responsibility" for K.S.'s injuries in "not being as protective as [she] should have been . . . leaving [K.S.] around [the] father when [she] knew he wasn't responsible enough." She wrote that in the future she would ensure K.S.'s caregivers were reliable and responsible, and that she would try better to pay attention to signs that something was wrong. However, the Mother did not indicate in her letter how K.S. received his injuries.

7

Kries's update indicated that the Mother was progressing toward achieving program goals as expected. She expressed guilt and grief that she had been unaware of who hurt K.S.

The Mother's section 388 petition asked for K.S.'s return to her with family maintenance services or the extension of reunification services. The juvenile court summarily denied the Mother's request for placement and family maintenance services, but proceeded with the Mother's second request of reunification services finding she had a minimal prima facie showing. The juvenile court also stated that any evidence it received as to the section 388 petition would be considered as to the section 366.26 hearing unless there was an explicit reason a party did not want such to be the case. To this end, the court admitted in evidence a CASA report dated March 14, 2014, the Mother's section 388 petition with attachments, Kries's curriculum vitae (CV), Kries's January 29, 2014 progress report, Mack's CV, Mack's treatment update letter dated March 10, 2014, the Mother's safety plan, and Agency reports dated December 12, 2013, February 6, 2014, and March 14, 2014. In addition, the juvenile court heard the testimony of three witnesses: Kries, Mack, and Jenkins.

Kries is a licensed therapist who facilitated a child abuse group in which the Mother participated. The Mother attended group since January 29 and attended 27 sessions as of March 14, 2014. Kries believed that the Mother had made great progress in group. For example, she showed insight as to the process of abused children and the type of adults those children become. Kries treated the Mother as a "non-protective parent" because it was not clear the Mother abused K.S., but apparent she did not do

8

enough to prevent abuse.  In this light, Kries opined that the Mother accepted responsibility as a nonprotective parent.  The Mother, however, did not acknowledge harming K.S., but admitted she was unaware that K.S was being harmed.  She also was able to express awareness as to the impact of the injuries K.S. sustained.

In Kries's opinion, the Mother appeared to be benefitting from the services she was receiving.  Kries testified that she addressed future reabuse of child abuse in her group sessions.

Also, as part of group, Kries required the Mother to write an atonement letter to K.S. and prepare a safety plan.  Kries found the Mother's effort with both tasks was appropriate.

During cross-examination, it became clear that Kries's treatment and evaluation of the Mother was more general and did not specifically take into account the Mother's situation with K.S.  Also, Kries appeared unsure to the extent the Mother was receiving reunification services and did not often talk to K.S.'s social worker.  In addition, she could not clearly recall her communications with the Agency about the Mother.  And Kries admitted that she did not have a lot of experience with section 300, subdivision (e) related cases.

Mack is a licensed family and marriage therapist, and was the Mother's personal therapist.  She first met with the Mother on September 27, 2013.  Mack never received any information on the case from the social worker, although she knew it was a section 300, subdivision (e) case and that the Mother had not been offered services.  Without court documents, Mack relied on the Mother's self-report to begin her therapy.  At the

9

time of the hearing, Mack had met with the Mother for 12 one-hour sessions. The type of treatment goals that Mack set up for the Mother included: the Mother demonstrate she could parent safely, put her child's needs ahead of her own, have empathy for the child, and have knowledge of the child's development. Mack stated that the Mother had been making progress with the goal of parenting safely, but she had not sufficiently addressed the other goals yet. Mack also acknowledged that the Mother had poor boundaries, and struggled to say no to others. Indeed, Mack indicated that the Mother stated "she had to protect her boyfriend" against the allegations that led to K.S.'s removal. However, Mack opined that the Mother would benefit from reunification services.

Jenkins was the social worker on K.S.'s case. Jenkins had reviewed all of the Agency's reports pertaining to K.S., and had authored several of them. He also observed the Mother and the Father during five visits with K.S. Jenkins reviewed the Mother's section 388 petition and the attached documents. In addition, he talked with Kries, Mack, the Mother, and the Father as well as examined the Agency's contact logs and delivered services logs. Based on his involvement in the case, Jenkins opined that reunification services were not likely to prevent reabuse of K.S. Jenkins stated that it did not appear that the Mother took responsibility for what happened to K.S., noting that the Mother "continues to state that she doesn't know what happened to him." Jenkins supported his opinion by observing that K.S. was nonverbal, could not protect himself, and was severely injured, "from his head to his toe." Jenkins also observed the Father did not take responsibility for K.S.'s injuries and the Mother and Father choose to visit K.S. together.

10

Jenkins further opined that it would not be detrimental to K.S. if reunification services were not offered to the Mother.

Jenkins also testified that the Mother's atonement letter was concerning because the Mother appears to take responsibility in the beginning of the letter, but later diverts responsibility to the Father. In addition, Jenkins found the Mother's safety plan inadequate because it did not seem to relate to K.S.'s situation and appeared to be copied from someone else's plan.

Finally, Jenkins opined that the Mother's and the Father's parental rights should be terminated and adoption should be K.S.'s permanent plan.

The juvenile court did not find the Mother established by clear and convincing evidence that: (1) reunification services would likely prevent reabuse; (2) failure to offer reunification services would be detrimental to the child because the child was positively and closely attached to the Mother; and (3) the circumstances changed and it was in the best interest of the child to be returned to her. It therefore denied the Mother's section 388 petition.

In explaining its decision, the juvenile court discussed the evidence presented during the hearing. The court explained that it discounted both Kries's and Mack's testimony because neither person had knowledge of the facts and circumstances surrounding the injuries to K.S. and his situation. It also expressed concern with Kries's "fuzzy" recollection of the history of the case and her interaction with Jenkins. In addition, the court was troubled by Mack's failure to "get to the heart of issues" during her sessions with the Mother. The court also found that the Mother's safety plan did not

11

indicate the Mother had gained insight into the causes of K.S.'s injuries or that the plan offered methods for avoiding future abuse. The court was similarly unimpressed with the Mother's atonement letter, finding it had "shortcomings in terms of acknowledging certain issues[.]"

The court emphasized the terrible abuse K.S. suffered, paraphrasing Jenkins: " 'The child had injuries from head to toe.' " The court found it concerning that the parents did not provide any sufficient explanation of the cause of K.S.'s injuries and their "complete lack of awareness or any idea as to who could have done this to their child." The court also was troubled that the parents claim to have not noticed the injuries.

In contrast to the witnesses testifying on behalf of the Mother, the court placed great weight on Jenkins's testimony. The court found Jenkins's opinion persuasive that failure to try reunification services would not be detrimental to K.S. The court also stressed that it did not find any evidence of a "close and positive attachment" between K.S. and the Mother that would indicate a failure to provide reunification services would be detrimental to K.S.

In rendering a decision as to section 366.26, the juvenile court followed the Agency's recommendations in the assessment report. It found by clear and convincing evidence that it was likely K.S. would be adopted if it terminated parental rights and found K.S. to be both generally and specifically adoptable. The juvenile court also found by clear and convincing evidence that none of the exceptions under section 366.26, subdivision (c)(1)(B) applied here.

12

As to the beneficial parent-child relationship, the court concluded the parents met the first prong of the exception with them regularly visiting K.S. The court also acknowledged how the parents were appropriate during supervised visitation, but also noted the limited circumstances of the visits. It concluded that it did not find that severing the parent-child relationships would deprive K.S. of a substantial, positive, emotional attachment. The court contrasted the many benefits K.S. received from the "stable, loving, consistent relationship" with the paternal grandmother as compared to "trauma and the insecurities in the first four months of his life." The juvenile court determined the parents had not established the beneficial relationship exception and found clear and convincing evidence that adoption was in K.S.'s best interest. It terminated parental rights and found the permanent plan of adoption appropriate.

Both parents filed timely notices of appeal.

## DISCUSSION

### I

### *SECTION 388 MOTION*

The Mother contends the court abused its discretion when it denied her modification petition. We disagree.

Under section 388, subdivision (a), a parent, interested person, or the dependent child (generically, petitioner) may petition the court to change, modify, or set aside a previous order on the grounds of changed circumstances or new evidence. The petitioner requesting the modification has the burden of proof to show a change of circumstances or

13

new evidence, and that the proposed modification is in the child's best interests. (*In re Jasmon O*. (1994) 8 Cal.4th 398, 415.)

However, "section 388 merely authorizes the court to modify a prior order. It does not purport to excuse the juvenile court from satisfying any other legal requirements that might apply to the modification." (*In re A.M*. (2013) 217 Cal.App.4th 1067, 1076 (*A.M.*).) Here, the court previously denied the Mother reunification services under section 361.5, subdivision (b)(5).[4] As such, the court could not modify its prior order denying reunification services "unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c); see *A.M.*, *supra*, at p. 1075.) And findings under section 361.5, subdivision (c) are to be made under a clear and convincing evidence standard, rather than a preponderance of the evidence standard required under section 388. (*A.M.*, *supra*, at p. 1077.)

We review the grant or denial of a petition for modification under section 388 for abuse of discretion. (*In re Shirley K*. (2006) 140 Cal.App.4th 65, 71; *In re Casey D*. (1999) 70 Cal.App.4th 38, 47.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*In re Stephanie M*. (1994) 7 Cal.4th

---

4    Section 361.5, subdivision (b)(5) provides: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: . . . (5) That the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian."

14

295, 318-319.) We will not disturb the trial court's exercise of discretion unless the trial court's decision was arbitrary, capricious, or patently absurd. (*Ibid*.) The complaining party must affirmatively establish abuse of discretion; it is not presumed. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423.)

The Mother argues that she demonstrated a change of circumstances. Specifically, she asserts that she presented evidence she: (1) separated from the Father; (2) engaged in services to address her protective issues; (3) accepted full responsibility for being a non-protective parent; and (4) acknowledged the severity of K.S.'s injuries. Additionally, the Mother insists granting her section 388 petition was in K.S.'s best interest and she established reunification services were likely to prevent reabuse. We are not persuaded.

Most of the Mother's arguments are contingent on the testimony of Kries and Mack as well as the Mother's safety plan and her atonement letter. Logically, she emphasizes that this evidence is ample to support her section 388 petition. However, the Mother utterly ignores that the juvenile court placed little weight on her evidence. The court went to great lengths to explain why it did not find Kries's testimony credible or Mack's testimony persuasive. The court stressed that neither therapist had complete knowledge of the circumstances surrounding K.S.'s injuries. Similarly, the court elucidated why it did not believe the Mother's safety plan or atonement letter helped her cause.

Essentially, the Mother's arguments here can be reduced to no more than asking this court to reweigh the evidence. This is not our role. "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the

15

conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.]" (*In re Casey D., supra,* 70 Cal.App.4th at pp. 52-53.)

At the hearing, Jenkins testified he had reviewed significant background material, talked to the parents and the Mother's therapists, and observed the parents visiting with K.S. He stated that it did not appear that the Mother took responsibility for what happened to K.S. He explained the shortcomings he perceived in the Mother's atonement letter and safety plan. Jenkins opined that reunification services would not likely prevent reabuse and it would not be detrimental to K.S. if reunification services were not offered to the Mother. The juvenile court was entitled to find the social worker's opinion credible, and to give great weight to his assessment. (*In re Casey*, *supra*, 70 Cal.App.4th at p. 53.) The fact that the Mother presented contrary evidence is of no moment.

Simply put, on the record before us, we cannot say the juvenile court's denial of the Mother's section 388 petition was arbitrary, capricious, or patently absurd. (See *In re Stephanie M*., *supra*, 7 Cal.4th at p. 318.) This is especially true here where the Mother had to prove by clear and convincing evidence that the reunification services would prevent reabuse. (*A.M*., *supra*, 217 Cal.App.4th at p. 1077.)

II

*BENEFICAL PARENT-CHILD EXCEPTION*

The juvenile court may terminate parental rights if there is clear and convincing evidence of adoptability. (§ 366.26, subd. (c)(1).) After the court determines a child is

16

likely to be adopted, the burden shifts to the parent to show the termination of parental rights would be detrimental to the child under one of the four exceptions listed in section 366.26, subdivision (c)(1)(B). (*In re C.F.G.* (2011) 193 Cal.App.4th 549, 553.) An exception to the termination of parental rights exists when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

"The parent must do more than demonstrate 'frequent and loving contact [,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant. [Citation.] Instead, the parent must show that he or she occupies a 'parental role' in the child's life." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The parent must also show that his or her relationship with the child " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*Ibid.*, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

We review the juvenile court's ruling under the substantial evidence test (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576), viewing the evidence in the light most favorable to the prevailing party (*In re J.I.* (2003) 108 Cal.App.4th 903, 911). We do not attempt to resolve conflicts in the evidence or evaluate the weight of the evidence; rather, we must draw all reasonable inferences in support of the court's findings and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.)

17

Here, the Mother and the Father do not challenge the juvenile court's finding that K.S. is adoptable. Instead, they argue their parental rights should not have been terminated given the beneficial nature of their ongoing relationship with K.S. The Agency acknowledges that the parents had regular visitations with K.S. Nonetheless, the Agency maintains that the parents have not shown that they occupy a parental role in K.S.'s life and failed to show their respective relationships with K.S. outweighed the benefits of adoption. We agree.

K.S. was taken into protective custody when he was only four months old after it was apparent that he had suffered brutal abuse. During visits with K.S., the Mother was consistent, appropriate, and affectionate. She played with K.S., fed him, and changed his diaper. Although tentative at first, the Father took on a more active role during later visits. K.S. was responsive to the Mother's voice, often smiled in his parents' presence, and attempted to speak to the Mother.

Although there was evidence that K.S. reacted positively to his parents, generally, he interacted well with adults and also was engaging and receptive with his grandmother, the CASA, and the visitation supervisor. Jenkins described K.S. as a "very friendly baby who appears to enjoy interacting with anyone who gives him attention." In addition, K.S. separated easily from his parents after visits and did not experience any distress from the separation. This evidence supports Jenkins's opinion that K.S. did not form a "substantial, positive emotional attachment" with either parent as required in *Autumn H., supra*, 27 Cal.App.4th at page 575. And the court placed great weight on Jenkins's testimony and was entitled to do so. (See *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

18

In addition, we note that neither parent offers a compelling argument why the possible detriment from terminating parental rights would outweigh the stability offered by adoption.  (See *In re Helen W.* (2007) 150 Cal.App.4th 71, 81; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  Indeed, the Mother only addressed this issue in her reply brief and the Father did not directly tackle it at all.  In failing to do so, both parents did not adequately discuss the abuse K.S. suffered.  Despite the appalling injuries K.S. endured, nowhere in the record is it apparent that the Mother or the Father explained how K.S. came to be injured or took responsibility for the injuries.  Although the Mother seems to somewhat blame the Father in her later therapy sessions, she appears to lack conviction.  She maintains contact with the Father, visits K.S. with the Father, and does not adequately address the Father spending time with K.S. if she were to regain custody.  The juvenile court noted that the Mother's safety plan failed to address the type of abuse K.S. experienced.

Although the Mother may have exhibited some awareness of her shortcomings as a nonprotective parent, the Father unabashedly ignores the fact his son was abused.  He offers no cogent explanation how it occurred or why he failed to take any action to protect his son.

Against this backdrop, we are satisfied that substantial evidence supports the juvenile court's finding that the beneficial parent-child exception did not apply here as to either the Mother or the Father.

Finally, we note that the Father argues this case in analogous to *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*).  It is not and we once again caution an appellant from relying

19

upon that case. In *S.B.*, we concluded the beneficial relationship exception does not require that a parent establish that a child's primary attachment was to him or her. (*Id*. at p. 299.) Nonetheless, since we issued our opinion in *S.B.*, we have discouraged the improper and inaccurate use of that opinion. (See *In re Jason J.* (2009) 175 Cal.App.4th 922, 937.) Further, we expressly limited the holding of *S.B.*: "[W]e once again emphasize that *S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact." (*In re C.F.* (2011) 193 Cal.App.4th 549, 558-559.) Here, there are not any "extraordinary facts" that compare favorably with *S.B*. The Father's reliance on that case is misplaced.

Accordingly, we conclude substantial evidence supports the juvenile court's finding that the beneficial relationship exception did not apply here.

DISPOSITION

The order is affirmed.

_____

HUFFMAN, Acting P. J.

WE CONCUR:


_____

NARES, J.


_____

McDONALD, J.

20